**EXHIBIT 1**

STATE OF NEW HAMPSHIRE

SULLIVAN, SS.                                                  SUPERIOR COURT
                                                                  [X] JURY

Optical Solutions, Incorporated

v.

Nanometrics Incorporated

Docket No. _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Optical Solutions, Incorporated ("OSI") by and through its

attorneys, Devine, Millimet & Branch, Professional Association, and files this Complaint and

Demand for Jury Trial against Defendant, Nanometrics Incorporated ("Nanometrics"). In

support of this Complaint, Plaintiff states as follows:

### INTRODUCTION

This case is a classic example of commercial "David" versus "Goliath." Here, a large

publicly-traded company, Nanometrics, exploits a small New Hampshire vendor, OSI, with false

promises when it serves its purposes.   Ironically, Nanometrics initially credited OSI with

"saving the company" when OSI's 40 micron lens solution enabled Nanometrics to offer new

technology that did not previously exist, and allowed Nanometrics to sell a new product line.

Due to that success, Nanometrics asked OSI to design the optical lens for its next generation of

semiconductor wafer testing equipment, a 25 micron lens.  Because Nanometrics did not want to

pay for all of OSI's engineering costs associated with creating the 25 micron optical lens,

Nanometrics instead offered OSI a long-term exclusive supply contract that made OSI the

exclusive supplier for small spot lens projects for the foreseeable future.  OSI relied on this long-

1

term exclusive supply contract and immediately invested heavily to support Nanometrics future needs identified in the contract.

In stark contrast to OSI's efforts to ensure it could meet its obligations, Nanometrics' own employees have confirmed that Nanometrics ignored its obligations and secretly went behind OSI's back and contracted with a different supplier in direct violation of the OSI exclusive supply contract.  Nanometrics' deception induced OSI into (a) incurring significant costs and (b) caused OSI to lose the enormous financial benefit of the supposedly exclusive supply contract equal to approximately $70,000,000 in revenue.   This lawsuit seeks to hold Nanometrics accountable for its deception and the losses that flow from that deception.

## PARTIES

1.      Plaintiff, Optical Solutions, Incorporated ("OSI"), is a corporation organized under the laws of the State of New Hampshire with a principal place of business at 26 Bull Run, Charlestown, NH 03603.

2.      Defendant, Nanometrics, Incorporated ("Nanometrics"), is, upon information and belief, a corporation organized under the laws of the State of California with a principal place of business at 1550 Buckeye Drive, Milpitas, CA 95035.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action because OSI is located in New Hampshire and Nanometrics engaged in continuous, substantial and persistent contact with OSI in New Hampshire concerning the contract and the manufacture of the lenses that are the issues in this case.

4.      Venue is proper in Sullivan County Superior Court because OSI's place of business is Charlestown, New Hampshire.

2

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### OSI Saves Nanometrics by Manufacturing a 40 Micron Optical Lens

5.      Nanometrics builds and sells equipment utilized in the semi-conductor wafer manufacturing industry for the purpose of evaluating process controls. This equipment is referred to as an Instrument.  As the semiconductor technology has evolved to allow for smaller and smaller semiconductor features, the testing equipment likewise has had to evolve to test ever shrinking features on the semiconductor wafers.

6.      In 2012, Nanometrics was facing a serious threat to its business.  At the time, Nanometrics' in-house engineering team was struggling to find a 40 micron optical lens solution for use in their Atlas II+ Instrument. The current lens provided within their ellipsometer was not sufficient to meet their needs. Indeed, without a suitable lens, Nanometrics would not be able to progress with its testing equipment and effectively compete in the market, which would affect its market share, bottom line and stock price.

7.      In search of a solution, Nanometrics contacted Bradley Piccirillo, owner of OSI, who was recommended to Nanometrics by Lockheed Martin Corporation.

8.      OSI (www.OpticalSolutionsInc.com) is a high end optical design and manufacturing company. It possesses full design, manufacturing and test capabilities in support of Vacuum Ultra Violet (VUV) through Far Infrared (FIR) applications. As an example of the level at which OSI works, it was the selected manufacturer of all the James Webb Space Telescope's (JWST) infrared imaging and fine guidance optics. This telescope is the replacement to the Hubble Space Telescope.

9.      OSI developed a manufacturing solution for the 40 micron lens that Nanometrics desperately needed, and provided Nanometrics with a quote on November 7, 2012 (OSI quote #1850b).  OSI's solution worked and met all of Nanometrics' requirements.

3

10. The Chief Operating Officer of Nanometrics, Bruce Crawford, on more than one occasion, told Mr. Piccirillo and Nanometrics' executive management and legal team that OSI's 40 micron solution "saved the company".

11. On December 19, 2012, Nanometrics issued Purchase Order #055637 for the 40 micron lens. Nanometrics subsequently amended this purchase order and converted it to a production purchase order, pursuant to which OSI became the supplier of record and manufactured all 40 micron lenses that Nanometrics installed in their Atlas II+ Instrument for the last 4-5 years.

12. Non-recurring engineering charges (NRE) are an essential part of developing a manufacturable product and a normal and usual cost borne by the purchaser. For the 40 micron lenses, OSI incurred significant expenses to develop this product, for which Nanometrics agreed to, and did pay, OSI.

**Nanometrics Offers OSI the 25 Micron Lens Project**

13. In Nanometrics' ever-evolving marketplace, once a product moves into production, a next-generation phase begins. Each one of these phases is called a node, and each node typically runs an indefinite length of time. Once the 40 micron lens project moved into production, Nanometrics needed to develop a solution for the next node, which in this case required a 25 micron small spot lens. This lens represented a significant engineering, design and manufacturing challenge. By 2013, Nanometrics already had spent years trying to design a 25 micron solution. Nanometrics had used their own internal design team as well as outside consultants to try to come up with a solution - they all had failed. Without a solution for this lens, Nanometrics would be unable to build and sell a next-generation testing Instrument.

4

14.     Because of OSI's success with the 40 micron lens, Nanometrics offered OSI the opportunity to quote the 25 micron lens.

15.     In June of 2013, Mr. Piccirillo met with Nanometrics' engineering team at their Milpitas, CA headquarters to discuss the 25 micron lens requirements in more detail. Based on this meeting, Nanometrics identified the requirements of the lens.

16.     On July 9, 2013, OSI issued a quote (#1867) for a 25 micron optical lens solution. Included in this quote was a $1,300,000 capital investment (NRE) to set up and build the lenses.

17.     Because the optical design solution was proprietary to OSI, OSI did not provide the prescription to Nanometrics. What OSI was selling Nanometrics was a finished product that met its needs. After the quote was provided, Nanometrics asked that OSI visit their Milpitas facility for another technical overview. Prior to this meeting OSI provided Nanometrics a Zemax file called "Black Box". This file allowed Nanometrics to evaluate system performance under any variable they wanted to (without seeing the OSI prescription). Upon completion of this overview, Nanometrics engineering staff concluded that "this lens meets our needs".

18.     After the overview, Bruce Crawford and Mr. Piccirillo met to discuss the quote. It was at this time that Nanometrics unequivocally told OSI that Nanometrics would not pay any NRE nor would it take any risk of cost associated with the development of this lens. This meant that if OSI was unsuccessful, OSI would not receive a penny for any costs related to its efforts.

19.     In response, OSI agreed to assume all risks related to this effort/attempt and agreed to forego payment of its development costs, but only in exchange for an exclusivity agreement whereby OSI would be the exclusive supplier of all small spot lenses for Nanometrics.

## Nanometrics Agrees to an Exclusivity Agreement

20.     On August 1, 2013, Nanometrics issued purchase order #059325 for the 25 micron lens, which was subsequently revised on December 28, 2013.

21.     On or about September 9, 2013, Nanometrics executed an Exclusivity Agreement which was memorialized in an Addendum to Purchase Agreement signed by OSI and Nanometrics (the "Exclusivity Agreement"). A copy of this Exclusivity Agreement is attached as Exhibit 1 to this Complaint.

22.     OSI understands that the terms of the Exclusivity Agreement and the very fact that Nanometrics was granting OSI exclusivity in the manufacture of "all small spot lens" was repeatedly discussed and ultimately approved by Nanometrics' senior management and its in-house counsel before Nanometrics signed the Exclusivity Agreement.

23.     Bruce Crawford commented multiple times to the management team "I'm signing this contract now. We are committing this company to have OSI as our optics supplier". Tim Stultz (CEO) and Nancy Eagan (legal counsel) reviewed the contract. Furthermore, the topic of granting OSI exclusivity was discussed openly in at least two quarterly business reviews (QBRs) which had 25-30 executives and managers present. The status of the 40 micron lens availability and the plan for 25 micron lens was brought up in these QBRs multiple times. Tim Stultz, Bruce Crawford, Ron Kisling (CFO), Tony Beddard (VP of Engineering), Mark Borowitz (Senior VP of Product Sales & Marketing), Nancy Eagan, as well as several other VP's, Directors, and Managers, were in the room as it was discussed, and were aware that an agreement was being signed.

24.     After the agreement between Nanometrics and OSI was signed by Bruce Crawford and Brad Piccirillo, Bruce Crawford presented the signed document to Nanometrics'

senior management and legal counsel and commented that "we have a signed agreement with OSI as the supplier of our 25 micron lenses".

**The Exclusivity Agreement Terms**

25.     The Exclusivity Agreement states that "[t]he purpose of this addendum is to document an exclusive product supply agreement between OSI and Nano. This addendum will address all small spot lens listed below for future purchases as listed in 2.2 below."

26.     It then defines Exclusive Supplier to mean "Nano will purchase all Small Spot Lens, as defined in Section 2.2 below, required for commercial sale from Optical Solutions Incorporated (OSI)."

27.     Section 2.2 of the Exclusivity Agreement defines "Small Spot Lens" to "mean the following lenses which meet the specifications and commercial product performance specifications established by Nano in the applicable design specification:" Section 2.2 then contains five bullet points identifying the series of Small Spot Lens projects to which the Exclusivity Agreement applies.

28.     The first bullet point refers to the 40 micron lens, which OSI has been producing for Nanometrics as a supplier of record, which means Nanometrics is in compliance with the Exclusivity Agreement.

29.     The second bullet point refers to the 25 micron lens (SE) which gave rise to the Exclusivity Agreement.  As will be explained in more detail below, OSI performed and met its obligations, while Nanometrics is in material breach of its obligations, and never had any intention of qualifying OSI as a supplier of record for the 25 micron lens.

30.     The third bullet point refers to a 25 micron companion lens (SR) that Nanometrics never offered to OSI, in direct violation of the Exclusivity Agreement.

7

31.     The fourth bullet point refers to a project that, again, Nanometrics never offered to OSI in direct violation of the Exclusivity Agreement. Based on OSI's understanding of this project, OSI is extremely confident that it would have achieved a solution to meet Nanometrics' needs. OSI understands that Nanometrics spent over a million dollars with another vendor regarding this product line without a successful product being developed.

32.     Finally, the fifth bullet point refers to future NextGen Reflective optics, which to date Nanometrics also has refused to provide to OSI as required by the Exclusivity Agreement. Because OSI provided acceptable 25 micron lenses and Nanometrics had signed the Exclusivity Agreement, OSI planned ahead, designed and began prototyping a next-generation optical solution to meet a less than 20 micron performance node. This solution took years of effort, had significant internal costs, but was determined to be worth the cost/risk so OSI could be in a position to support the next node. OSI can provide data in support of this claim. In response to these needs, OSI positioned itself to cover the next 10-15 years of Nanometrics' products. OSI made these decisions because the scope of future work outlined in the Exclusivity Agreement describe a very long-term partnership.

33.     Section 3 of the Exclusivity Agreement states: "If, on or before the date of completion established in the design specification, which date may be amended by mutual agreement, OSI is able to produce small spot lens which meets the specifications and commercial product performance specifications established by Nano in the applicable design specifications, OSI shall be Nano's Exclusive Supplier of Small Spot Lens for the commercial life of the products in which the Small Spot Lens is deployed." (Emphasis added).

34.     Finally, Section 4.1 of the Exclusivity Agreement states: "In the event that OSI is not able to meet the product specifications, commercial product performance, or peak volumes to

8

meet Nano's commercial requirements, which may be reviewed and modified to allow for OSI to have reasonable ramp up time to meet such commercial volumes, Nano may purchase Small Spot Lens from alternative suppliers.  Notwithstanding the foregoing, Nano shall give notice to OSI in the event that such commercial requirements have increased, and OSI shall have a reasonable period of time to ramp up to meet such commercial volumes."

### OSI Relies on the 25 Micron Purchase Order and the Exclusivity Agreement

35.     At all relevant times, OSI relied on Nanometrics' promise for and ultimate execution of the Exclusivity Agreement.

36.     On August 1, 2013, OSI received Nanometrics' Purchase Order #059325 for the 25 Micron Lenses.   The next day, August 2, 2013, OSI entered purchase orders with its vendors for $580,000 for required manufacturing capabilities in direct support of this Nanometrics' purchase order.

37.     To ensure that it could meet the "peak volumes" of Nanometrics' "commercial requirements" under this long-term Exclusivity Agreement, OSI also began negotiating, and ultimately purchased, a company called Opticraft (www.OpticraftInc.com) on July 1, 2015.  The decision to buy this company was heavily influenced by the need to support the Exclusivity Agreement. OSI would never have acquired Opticraft if it had known that Nanometrics had violated or was about to secretly violate the Exclusivity Agreement.

38.     OSI also relied on the Exclusivity Agreement in making capital investments as the Exclusivity Agreement ensured that, so long as OSI could manufacture optics as set forth in Section 2.2 of the Exclusivity Agreement OSI would become the "supplier of record" in Nanometrics' equipment which, as explained below, is highly lucrative.

39. Indeed, in this highly specialized market, the major purchasers of test equipment such as Samsung do not allow substitution of critical parts, defined as anything that comes in contact with the wafer, in equipment that it purchases. This is by definition, what a supplier of record is (i.e. no substitution on parts or suppliers).

40. Thus, once OSI's optics have been selected and placed in the test equipment, Nanometrics' end users would not allow the substitution of other optics during the product life cycle of the device being manufactured (the Nanometrics' Instrument). For example, OSI is the "supplier of record" with respect to the 40 micron lens included in the Atlas II+ Instrument.

41. In other words, Nanometrics cannot substitute another supplier for OSI. This inability to substitute suppliers ensures OSI a constant stream of revenue to offset its development costs and obtain a profit.

## OSI Performs Under the Purchase Orders and Exclusivity Agreement

42. During all relevant times, OSI continued to manufacture and deliver 40 micron lenses to Nanometrics as the "supplier of record." OSI is the "supplier of record" for this optic. Nanometrics has paid OSI for all 40 micron lenses.

43. In addition, beginning in 2013 and continuing through November of 2016, OSI manufactured and shipped 12 sets (24 units) of 25 micron lenses to Nanometrics.

44. Nanometrics received all 12 sets of 25 micron lenses from OSI. All were accepted, none rejected, and all paid for by Nanometrics. Nanometrics never once notified OSI that OSI's 25 micron lenses do not meet the statement of work or were otherwise deficient or non-conforming.

45. Once OSI delivered the 12 sets of the 25 micron lenses to Nanometrics, OSI had no ability to monitor Nanometrics testing of, or integration of, the 25 micron lenses into Nanometrics' test equipment. These steps are all done internally and privately by Nanometrics.

46. Furthermore, the OSI optics are but one piece to the final Nanometrics' Instrument. Developing Nanometrics' Instruments can take years and millions of dollars to complete.

47. OSI believed that because Nanometrics had not contacted OSI about moving into the production phase of the 25 micron lens project, or the design and production phase of the companion SR lens for the 25 micron project (bullets 2 and 3 in the Exclusivity Agreement), along with the fact that OSI delivered and was paid for 12 sets of 25 micron lenses with no rejects, meant that Nanometrics was occupied addressing internal design challenges.

48. Further, the Exclusivity Agreement contains no time limit. Knowing that the Exclusivity Agreement was in place, OSI waited to be contacted by Nanometrics when it was ready to move forward. OSI was and continued to be ready to meet its obligations as soon as Nanometrics instructed it to do so.

49. In the meantime, OSI continued to ship optical lenses.

50. In addition, Section 4.1 of the Exclusivity Agreement contains an express notice provision that requires Nanometrics to notify OSI of any changes in its commercial requirements and give OSI the opportunity to meet these changes before seeking another supplier. OSI has never received any such notice from Nanometrics.

**Nanometrics' Breaches and Deception is Finally Revealed**

51. By the summer of 2016, most of the senior management team at Nanometrics, with whom OSI worked, had retired or left Nanometrics. It was during this summer that

Nanometrics planned their first vendor appreciation event (Supplier Day) in California (the "Event"). Mr. Piccirillo was invited to this Event, and believing he needed to develop a relationship with the current Nanometrics team, Mr. Piccirillo, on behalf of OSI, decided to attend. It was while attending this Event that Mr. Piccirillo learned of Nanometrics' deception and breach of the Exclusivity Agreement.

52.    During the Event, a Nanometrics' team member pulled Mr. Piccirillo aside and told him "what Nanometrics did to you was so wrong". At that time, Mr. Piccirillo was also informed that two Atlas III Instruments, which require 25 micron lenses, already had been shipped using another supplier's optics. Upon hearing this information, Mr. Piccirillo immediately knew that because of what Nanometrics had done, OSI had zero potential to be a supplier of record for this instrument – a direct violation of the Exclusivity Agreement. Mr. Piccirillo sought an explanation from Mr. Michael Shaughnessy (VP of Global Operations). Mr. Shaughnessy, being new, claimed not to know about the Exclusivity Agreement.

53.    Mr. Piccirillo was also informed by former Nanometrics' employees that OSI never had a chance of becoming supplier of record for this instrument, which is in direct violation of bullets 2, 3 and 4 of Section 2.2 of the Exclusivity Agreement. The only way to become a supplier of record is to go through the qualification process, which entails qualification time in Nanometrics' engineering lab, at customer sites, or in beta units. Mr. Piccirillo had been told that Nanometrics' engineers battled internally to be given tool time to qualify OSI's 25 micron lens, but were denied by senior management, the same senior management who approved the Exclusivity Agreement. This means Nanometrics will have virtually no records of any steps it took to act in good faith and honor the Exclusivity Agreement. OSI also has information from upper level management that during quarterly business reviews (QBR's) the

12

executive management team, including the CEO and legal counsel, was specifically told "Guys, you can't do this, we have an exclusive contract with OSI". Nanometrics ignored the Exclusivity Agreement anyway.

54.     Qualification is an essential step to becoming a supplier of record. As such, OSI believes that Nanometrics never intended to honor the terms of the Exclusivity Agreement and instead signed it solely to avoid paying $1,300,000 in OSI engineering costs while guaranteeing that Nanometrics would have lenses available if they needed them. OSI believes that discovery will further expose Nanometrics' duplicity.

55.     In short, OSI "bet it all" on the Exclusivity Agreement, and Nanometrics simply ignored the plain language and intent of the Exclusivity Agreement, cutting OSI out of opportunities to recover profit, get a return on its capital investment, and to position both companies in a much more financially healthy long-term future.

56.     To further add to the harm, shortly after first learning of Nanometrics deception, OSI shipped the remaining open orders of 40 micron and 25 micron lenses.

57.     Instead of paying both orders, Nanometrics engaged in economic extortion by holding the 25 micron lens payment hostage until OSI reluctantly agreed to provide Nanometrics with a quote for production quantity pricing on a 40 micron lens order that was below minimum order quantities. Once OSI agreed to change pricing, and provided Nanometrics with a revised quote, Nanometrics paid OSI for the 25 micron lenses. Part of the quote rewrite was OSI's insistence of a change in terms from Net 30 to COD. When Nanometrics questioned this change, Mr. Piccirillo advised them that "Nanometrics will never hold OSI hostage for payment again." Also during this discussion OSI sent Michael Shaughnessy a copy of the Exclusivity Agreement. When Mr. Piccirillo questioned him about this in a later conversation, Mr. Shaughnessy said "it's

not worth the paper it's written on." This cavalier attitude is emblematic of how Nanometrics, a large publicly-traded company, has exploited OSI, a small privately-held company, throughout their relationship.

**Nanometrics' Malfeasance Causes OSI Substantial Harm**

58.     Nanometrics' conduct described above constitutes direct and material breaches of the Exclusivity Agreement.

59.     OSI met all of the requirements provided by Nanometrics, yet Nanometrics deliberately ignored the Exclusivity Agreement and selected another supplier for the 25 micron lenses.  By doing so, Nanometrics excluded OSI as a supplier going forward, and demonstrated that it had no intention of following the terms of the Exclusivity Agreement by making OSI the supplier of record.

60.     Based on discussions with Mike McBroom, Nanometrics' Sr. Director, Supply Chain, OSI understands that Nanometrics will need one additional order of 40 micron lenses next year.  Combined with what Nanometrics has previously ordered from OSI, OSI will have received $6,016,380 in revenue from Nanometrics for just the 40 micron SE lenses (Section 2.2 bullet 1 of the Exclusivity Agreement).

61.     The revenue from the 40 micron lens project pales in comparison to the revenues OSI would have realized for the 25 micron lens and other projects had Nanometrics honored the Exclusivity Agreement.  If the 25 micron lens project requires as many units as the 40 micron lens project, OSI would have received approximately $15,054,480 in revenue for the SE lens portion (bullet 2 of section 2.2 in the Exclusivity Agreement) and another $7,527,240 in revenue for the SR lens component (bullet 3 of section 2.2 in the Exclusivity Agreement).  Indeed, this technology is more difficult to achieve and thus more costly for OSI to manufacture.

62.     Nanometrics violated the Exclusivity Agreement with respect to bullet four of section 2.2. As noted previously, OSI is confident that it could have come up with a solution. OSI estimates that the value of this node would be consistent with the SR and SE 25 micron node, which amounts to $22,581,720.

63.     Regarding the last Small Spot Lens identified in the Exclusivity Agreement bullet 5 of Section 2.2, OSI has already created a solution for Nanometrics and stands ready and able to perform.

64.     Assuming the cost for a technically advanced optical solution that will meet the need of section 2.2 bullet 5 (Future NextGen Reflective optics) is not more than the cost for the 25 micron SE lens, OSI was deprived of another $22,581,720 in revenue because of Nanometrics breaches of the Exclusivity Agreement.

65.     The combination of section 2.2 Small Spot Lens bullets 2, 3, and 5 represents 10-15 years of lost revenue for OSI.

66.     In total, Nanometrics conduct has caused OSI to lose total revenue in excess of $70,000,000.

67.     OSI is aware of no justification for or defense of Nanometrics' conduct.

### COUNT I – Breach of Contract

68.     OSI repeats, re-alleges, and incorporates by reference herein each and every paragraph above and below as if fully set forth herein.

69.     OSI performed all of its obligations required by the Exclusivity Agreement, including providing conforming 25 micron lenses.

70.     Nanometrics materially breached the Exclusivity Agreement with OSI by secretly refusing to qualify and use the conforming 25 micron lenses manufactured by OSI and instead

contracting with another supplier to supply 25 micron lens. It also breached the Exclusivity Agreement by not providing OSI with an opportunity to manufacture any of the other lens projects specifically identified in the Exclusivity Agreement.

71.     Nanometrics' action was without justification or excuse and without notice to OSI, even though the Exclusivity Agreement contains a specific notice section.

72.     As a result of Nanometrics' breaches, OSI is entitled to recover actual, incidental and consequential damages from Nanometrics, including lost profits, interest, engineering and capital costs, attorney's fees and costs, and all other available damages, all in an amount to be proven at trial but expected to exceed $70,000,000.

### COUNT II – Implied Covenant of Good Faith and Fair Dealing

73.     OSI repeats, re-alleges, and incorporates by reference herein each and every paragraph above and below as if fully set forth herein.

74.     All contracts, including the Exclusivity Agreement, include an implied covenant of good faith and fair dealing.

75.     Nanometrics breached this covenant by depriving OSI of the key benefit to OSI of the Exclusivity Agreement when it secretly utilized a different supplier for the 25 micron lenses and refused to offer any other small spot lens projects to OSI.

76.     As a result of Nanometrics' breach of this covenant, OSI is entitled to recover actual, incidental and consequential damages from Nanometrics, including lost profits, interest, engineering and capital costs, attorney's fees and costs, and all other available damages, all in an amount to be proven at trial but expected to exceed $70,000,000.

## COUNT III – Violation of RSA Chapter 358-A

77.     OSI repeats, re-alleges, and incorporates by reference herein each and every paragraph above and below as if fully set forth herein.

78.     Nanometrics is engaged in trade or commerce as that term is defined in RSA Chapter 358-A.

79.     Chapter 358-A makes it a violation to engage in unfair and deceptive conduct and applies equally to business-to-business transactions.

80.     Nanometrics engaged in unfair and deceptive conduct within the meaning of RSA Chapter 358-A by agreeing to an Exclusivity Agreement with OSI, reaping the benefits of OSI's technology and OSI's willingness to forego recovery of its engineering costs, and then secretly depriving OSI of its benefit by using a new supplier for the 25 micron lens.  In addition, Nanometrics also failed to qualify OSI's 25 micron lens and failed to offer to OSI any of the other small spot lens projects identified in the Exclusivity Agreement to OSI.

81.     Based on interviews with former Nanometrics employees along with statements made by current employees, OSI believes that such conduct by Nanometrics was knowing and willful, thus entitling OSI to an award of up to treble damages.

82.     As a result of Nanometrics' violations, OSI is entitled to all of its actual damages as permitted pursuant to RSA Chapter 358-A and set forth above plus attorney's fees, interest, costs and at least double if not treble damages.

## DEMAND FOR JURY TRIAL

83.     Plaintiff demands a trial by jury on all issues so triable.

17

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

A.      Enter judgment in its favor on all of the above Counts;

B.      Award damages to OSI in an amount to be proven at trial, including double or treble damages;

C.      Award reasonable attorney's fees and costs; and

D.      Grant such other and further relief as is just and proper.


Respectfully submitted,

**OPTICAL SOLUTIONS INCORPORATED**

By its Attorneys,

**DEVINE, MILLIMET & BRANCH,
PROFESSIONAL ASSOCIATION**

Dated:  August 1, 2017              By: _____

Matthew R. Johnson, Esq. (NH Bar No. 13076)
Jonathan M. Shirley, Esq. (NH Bar No. 16494)
111 Amherst Street
Manchester, NH 03101
(603) 669-1000
mjohnson@devinemillimet.com
jshirley@devinemillimet.com

# EXHIBIT A

**Addendum to Purchase Agreement**

This Addendum to Purchase Order numbers 055637 and 059325 (Addendum) between Optical Solutions Incorporated (OSI) and Nanometrics Incorporated ("Nano") amends Purchase Order No. 055637 dated December 19, 2012, and 059325 dated August 1, 2013 (aggregately the "PO").  Unless modified herein, all terms in the PO shall remain unchanged and in full force and effect.

1. **Introduction**

   The purpose of this Addendum is to document an exclusive product supply agreement between OSI and Nano. This addendum will address all small spot lens listed below for future purchases as listed in 2.2 below.

2. **Definitions**

   **2.1 Exclusive Supplier** shall mean Nano will purchase all Small Spot Lens, as defined in Section 2.2 below, required for commercial sale from Optical Solutions Incorporated (OSI).

   **2.2 Small Spot Lens** shall mean the following lenses which meet the specifications and commercial product performance specifications established by Nano in the applicable design specification:
   - SE lens set in 6 element 190-1700 wavelength and 35um spot size  (design specification attached)
   - SE lens set (in 6-8element, reference) 190-1700 wavelength and 25um spot size (design specification to be provided by Nano)
   - SR lens set (in 6-8 element, reference)190-1700 wavelength 25um spot size (Impulse head) (design specification to be provided by Nano)
   - SR lens set (in 6-8 element, reference)190-1700 wavelength 25um spot size (NGSR) (design specification to be provided by Nano)
   - Future NextGen Reflective optics (design specification and commercial requirements to be provided by Nano)

3. **Supply Terms**

   If, on or before the date of completion established in the design specification, which date may be amended by mutual agreement, OSI is able to produce small spot lens which meets the specifications and commercial product performance specifications established by Nano in the applicable design specifications, OSI shall be Nano's Exclusive Supplier of Small Spot Lens for the commercial life of the products in which the Small Spot Lens are deployed.

4. **Other Terms**

   **4.1** In the event that OSI is not able to meet the product specifications, commercial product performance, or peak volumes to meet Nano's commercial requirements, which may be reviewed and modified to allow for OSI to have reasonable ramp up time to meet such commercial volumes, Nano may purchase Small Spot Lens from alternative suppliers. Notwithstanding the foregoing, Nano shall give notice to OSI in the event that such commercial

1

requirements have increased, and OSI shall have a reasonable period of time to ramp up to meet such commercial volumes.

4.2 Purchase of Small Spot Lens shall be at the price and terms and conditions set forth in the PO. For those lens not yet subject to a PO, price will be negotiated by the parties and terms and conditions shall be Nano standard terms and conditions.

4.3 OSI may not assign or otherwise transfer this agreement without the advance written consent of Nano.

Approved and Agreed OSI

By: _____

Title: _President_

------------------------------------------------

By:  Bruce A. Crawford

Title:  Chief Operations Officer

Nanometrics Incorporated

Date: 09/09/13                          Date: _09/09/13_

2